An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-336

NORTH CAROLINA COURT OF APPEALS

Filed:  21 January 2014

STATE OF NORTH CAROLINA

v.

Carteret County
No. 11 CRS 51395

AARON WESLEY McGARVA


Appeal by defendant from judgment entered 26 April 2012 by Judge Kenneth F. Crow in Carteret County Superior Court.  Heard in the Court of Appeals 12 September 2013.

> *Attorney General Roy Cooper, by Assistant Attorney General Kathryne E. Hathcock, for the State.*
>
> *Cheshire Parker Schneider & Bryan, PLLC, by John Keating Wiles, for Defendant.*


ERVIN, Judge.


Defendant Aaron Wesley McGarva appeals from a judgment sentencing him to a term of 132 to 168 months imprisonment based upon his consolidated convictions for second degree murder and felonious hit and run driving involving serious injury or death. On appeal, Defendant argues that the trial court erred by denying his motion to dismiss the second degree murder charge on the grounds that the record did not contain sufficient evidence

to support a finding that he acted with malice and by improperly instructing the jury concerning the extent, if any, to which voluntary intoxication sufficed to preclude a finding of malice. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that the trial court's judgment should remain undisturbed.

## I. Factual Background

### A. Substantive Facts

At approximately 9:00 p.m. on 2 April 2011, Defendant Aaron McGarva went to the apartment of his friend, Chris Taylor, in downtown Morehead City so that the two of them could play their guitars. After Defendant's arrival, the two men began playing their guitars, drinking beer, and smoking some marijuana that Defendant had brought with him. In addition, Defendant offered LSD to Mr. Taylor, who consumed some of the LSD although he had never ingested that substance before. Mr. Taylor did not remember seeing Defendant consume any LSD.

A while later, Mr. Taylor and Defendant walked to a downtown bar, where they encountered their friend, Christopher Baggett, and his girlfriend, Morgan Smith, both of whom were invited to come back to Mr. Taylor's apartment to play music. Mr. Baggett and Ms. Smith arrived at Mr. Taylor's apartment at

around 10:00 or 11:00 p.m. Although Defendant offered some LSD to Mr. Baggett, he declined that offer. After remaining at Mr. Taylor's apartment for a couple of hours, Mr. Baggett and Ms. Smith left because, as Mr. Baggett noted, "[y]ou could tell that they were starting to feel the effects of the acid" and because, "if you're not in the same mindset as them, it kind of makes you feel awkward."

Although Defendant was "really chill" and "just kind of relaxed" for most of the night, Mr. Taylor noticed a change in Defendant's behavior at around 5:00 a.m. on 3 April 2011. At that point, Defendant went from being "chill" to "pretty-much ready to go" and wanted to load up all of the guitar-related equipment in his car so that Mr. Taylor could come play guitars at Defendant's house. After Mr. Taylor told Defendant that he was not going to comply with Defendant's wishes, Defendant grabbed Mr. Taylor's amplifier, unplugged it, and put it in his car.

As Mr. Taylor attempted to retrieve his amplifier from Defendant's car, the two men exchanged words in the parking lot. Mr. Taylor had never seen Defendant, who was "agitated" and "belligerent," act in this manner before. Upon regaining possession of his amplifier, Mr. Taylor returned to his apartment and locked the door in an effort to avoid a fight.

After beating on the door of Mr. Taylor's apartment for a few minutes, Defendant got into his car, revved the engine a couple of times, and drove off.

The intersection of 4th Street and Arendell Street, at which Mr. Taylor's apartment was located, was depicted on a video camera operated by the State Ports Authority on the early morning of 3 April 2011. According to the images captured by this video camera, three vehicles were traveling eastbound toward the high rise bridge that connected Morehead City and Beaufort at 5:32 a.m. on 3 April 2011. The first of these vehicles was a Beaufort city police car, which was followed about eight seconds later by a Toyota Tacoma pickup truck driven by William Henry Knott, Jr., and about thirteen to fifteen seconds later by Defendant's Mitsubishi sports car. According to the images captured by the video camera, Defendant's Mitsubishi made a proper stop at a stop sign and turned right before proceeding toward the bridge.

A different video camera, which was also operated by the State Ports Authority, faced the high rise bridge and depicted Mr. Knott's pickup truck as it traveled east across the bridge. Defendant's vehicle, which appeared as a "little white dot," could be seen on images captured by this second camera as it headed towards Mr. Knott's truck. According to the images

captured on the second video camera, an explosion occurred as Defendant's vehicle crashed into the back of Mr. Knott's truck.

According to Lieutenant James Gaskill of the Morehead City Police Department, who testified as an expert in accident reconstruction, Defendant's vehicle drove up underneath Mr. Knott's pickup truck at the moment of impact and pushed his truck toward the right to a point adjacent to the bridge's guardrail. At that point, Mr. Knott's truck flipped over, slid down the guardrail, and fell from the bridge. Lieutenant Gaskill estimated that, at the time of the collision, Mr. Knott's pickup truck was traveling at a minimum speed of 54 miles per hour, that Defendant's Mitsubishi was traveling at a minimum speed of 102 miles per hour, and that Defendant made no attempt to stop, slow, or otherwise avoid the crash. Mr. Knott died as a result of a broken neck sustained in the collision.

Nivard Malcolm lived near the foot of the high rise bridge. About 5:30 a.m. on 3 April 2011, Mr. Malcolm heard a loud rumbling noise that lasted for about ten to fifteen seconds and sounded like a cinematic depiction of a train crash. After he went outside, Mr. Malcolm saw a smoking car that had sustained damage to its front end. Although the vehicle was unoccupied, Mr. Malcolm saw someone lying on his back in the vicinity of the car. When Mr. Malcolm approached the person in question and

inquired about his condition, the person repeatedly said, "I'm dead," then got up; swore at Mr. Malcolm; said, "I'm going home"; and walked away in the direction of Beaufort. Although the person whom he observed was agitated, Mr. Malcolm thought that he was walking with an unremarkable gait at the time of his departure.

Deputies James McClenny and Michael Mull of the Carteret County Sheriff's Department were among the first persons to arrive at the scene of the collision on the high rise bridge. Both deputies observed a large amount of debris on the bridge at the time of their arrival. More specifically, Deputy McClenny found what appeared to be the rear glass portion of a pickup truck that displayed a complete VIN number that was assigned to a pickup truck registered to Mr. Knott. After realizing that a large section of the bridge's guardrail was missing and looking over the side of the bridge without seeing a car in the water, Deputy Mull walked down the bridge and saw a burgundy convertible in the bushes off the eastbound side of the road. Although Deputy Mull did not see the driver of the convertible, he did observe a bag of marijuana and a marijuana grinder on the ground adjacent to the driver's seat.

After being dispatched to the high rise bridge in the aftermath of the collision, Officer Chris Morey of the Beaufort

Police Department was told to be on the lookout for a pedestrian heading in the direction of Beaufort. Subsequently, Officer Morey observed a white male, who was later identified as Defendant, walking in the middle of the road towards Beaufort. After Officer Morey approached Defendant and attempted to speak to him, Defendant said something about "a guitar and Jesus" and admitted that he had been driving the wrecked vehicle that had been found near the railroad tracks at the foot of the high rise bridge. However, when Officer Morey attempted to get Defendant to come to his patrol vehicle for further questioning, Defendant "flipped out" and started cursing, swinging his arms, and trying to shove Officer Morey.

As a result of his inability to detain Defendant on his own, Officer Morey radioed Officer Tim Tucker of the Beaufort Police Department with a request for assistance. At the time that Officer Tucker arrived, Defendant was on the ground with Officer Morey, who was attempting to position Defendant's hands behind his back for the purpose of placing Defendant in handcuffs. Acting jointly, Officers Tucker and Morey were able to handcuff Defendant.

After Defendant had been detained, Officers Tucker and Morey noticed that Defendant had a small fresh bump, or "goose egg," on his forehead; that his pupils were very large and

dilated; and that Defendant was behaving in an erratic manner. More specifically, Defendant was agitated, angry, unable to sit still, and randomly broke down in tears. According to Officer Tucker, Defendant was "talking out of his head," repeating random and apparently irrelevant statements such as "Jesus Christ" and "I want a guitar." Defendant did admit to having smoked marijuana earlier. Based upon the observations that he made of Defendant's condition, appearance, and conduct, Officer Tucker concluded that Defendant was under the influence of some impairing substance.

Emergency medical personnel were dispatched to the scene as well. Dione Willis, a paramedic with Beaufort Emergency Medical Services, observed that Defendant was acting in a hostile and belligerent manner and that he was waving his arms around to such an extent that the officers were having a difficult time settling him down. Defendant treated the emergency medical service personnel in a hostile manner, screaming over and over, "Jesus Christ. Jesus Christ. I want a Ferrari. Where's my guitar? I'm going to slap you--with expletives--if I don't get it." After placing Defendant on a heart monitor, the emergency medical service personnel noticed that Defendant's heart was beating very rapidly and that he "didn't act like he was in his right mind." Although Defendant had a "little bit of a goose

egg" on his mid-forehead area, the emergency medical personnel saw no evidence that Defendant had sustained any major injury. The law enforcement officers and emergency medical service personnel who were present at the scene needed between eight and ten minutes to get Defendant under control and into the ambulance because he was fighting and screaming and cursing. On her medical report prepared for the hospital, Ms. Willis wrote that Defendant "was higher than a kite."

After his arrival at Carteret General Hospital, the attending medical personnel noted that Defendant's pupils were dilated and that he had a contusion on his forehead. Defendant continued to act in an erratic manner after reaching the hospital. For example, Defendant was extremely agitated and made bizarre statements like "Jesus Christ. Jesus Christ. I want my guitar. I want a fast car." As a result of his behavior, Defendant had to be restrained. Although Defendant admitted having smoked marijuana, he denied that he had consumed any "spice or bath salts." In light of Defendant's behavior, Emergency Room Technician David Garner reached the conclusion that Defendant was under the influence of some substance other than marijuana and that Defendant was "really really impaired."

At the hospital, the attending medical personnel gave Defendant two doses of the sedative Ativan in order to calm him

down sufficiently so that a CT scan could be performed. Since the Ativan did not sufficiently sedate Defendant, he was given Haldol, an anti-psychotic drug, which did operate in such a manner that the CT scan could be performed. A sample of Defendant's urine was taken for later chemical analysis. Defendant's blood was not, however, tested for the presence of LSD.

Dr. John Robert Duda, the physician who was primarily responsible for treating Defendant at Carteret Medical Center, explained that unusual behavior is sometimes observed following a brain injury. After examining the results of Defendant's CT scan, Dr. Duda saw no signs that Defendant had sustained any brain injury.[1] Although testing performed upon a urine sample taken from Defendant revealed the presence of a metabolite of marijuana and benzodiazepine, a component of valium and other Ativan-like drugs, Dr. Duda expressed the opinion that the benzodiazepine metabolite that was reflected in the drug screen probably did not stem from the Ativan administered to Defendant at Carteret General and could have resulted from consumption that occurred at any time from thirty minutes to two days before the urine sample in question was taken. As a result of the fact

---

[1]However, Defendant's Glasgow coma scale results indicated that he had sustained a brain injury that registered in the low end of the moderate injury portion of the scale.

that the screening performed upon the urine sample taken from Defendant did not disclose the concentration of the marijuana found in Defendant's system, Dr. Duda was unable to determine the effect that the marijuana had on Defendant's faculties.

In light of Defendant's agitated behavior and the size of his pupils, Dr. Duda had concerns that Defendant might have consumed "sympathomimetics," which are drugs, such as cocaine, ecstasy and amphetamines, that stimulate an individual's nervous system. However, the drug screen revealed that none of these drugs were present in Defendant's system. Although LSD would generally be classified as an hallucinogen, the consumption of LSD can cause dilated pupils. According to Dr. Duda, some LSD users have a very calm experience after consuming LSD, while others become agitated and have a "bad trip." Although dilated pupils can result from a concussion or from a frightening experience and although symptoms such as confusion, lack of focus, incoherent speech, hostility, and short-term memory loss can result from a brain injury, Defendant's good pupil response and large dilation led Dr. Duda to believe that "there was something else in addition to the head injury that was producing [Defendant's dilated pupils]." Ultimately, Dr. Duda concluded that Defendant suffered an acute blunt head injury and multiple

trauma due to a motor vehicle collision, and had altered mental status and a concussion.

Lieutenant Tim Tomczak of the Raleigh Police Department, an expert in recognizing the drugs consumed by other individuals based on the symptoms exhibited by such persons, reviewed Defendant's case file, which included various medical reports and statements taken from the law enforcement and medical personnel who had observed Defendant, and testified that, "overwhelmingly, what was given to me was very consistent with LSD impairment." According to Lieutenant Tomczak, LSD, like cocaine and amphetamines, is classified as a sympathomimetic agent. Lieutenant Tomczak, like Dr. Duda, believed that Defendant's elevated pulse, elevated blood pressure, and dilated pupils indicated that Defendant was under the influence of a sympathomimetic drug. In addition, Lieutenant Tomczak opined that Defendant's bizarre behavior and the strange statements that he had made indicated that Defendant was under the influence of an hallucinogenic drug. In Lieutenant Tomczak's opinion, the statements that Defendant made about "guitars," "Ferraris," and "Jesus Christ" were more consistent with the consumption of an hallucinogenic agent like LSD than they were with the consumption of drugs like cocaine or amphetamines. Dr. Duda's testimony that a concussion can result in dilated pupils,

slurred speech, memory loss, agitation, and bizarre statements did not surprise Lieutenant Tomczak, given that these symptoms are consistent with LSD consumption as well. According to Lieutenant Tomczak, everything in the medical records was consistent with LSD use, with the exception of Defendant's uncontrollable nystagmus of the eyes, a symptom that was inconsistent with LSD use alone and that could be consistent with the incurrence of a brain injury.

After being discharged from the hospital and released into police custody at around 1:00 p.m. on 3 April 2011, Defendant was interviewed by Agent David Chunn of the North Carolina Alcohol Law Enforcement Division who was, at that time, an officer with the Morehead City Police Department. Once he had waived his *Miranda* rights, Defendant told Agent Chunn that he had gone to a friend's house to upgrade a guitar, that he had been there for a few hours, and that he had left his friend's apartment at approximately 5:30 a.m. As he drove home over the high rise bridge, Defendant noticed at the last second that there was a vehicle in front of him. However, it was too late to avoid a collision by the time that he noticed the other vehicle. Defendant estimated that he was traveling about 50 or 55 miles per hour at the time that he collided with the other vehicle.

## B. Procedural History

On 3 April 2011, magistrate's orders charging Defendant with felonious hit and run driving involving serious injury or death and felony death by vehicle were issued. On 2 May 2011, the Carteret County grand jury returned bills of indictment charging Defendant with hit and run driving involving serious injury or death and second degree murder. The charges against Defendant came on for trial before the trial court and a jury at the 16 April 2012 criminal session of Carteret County Superior Court. On 26 April 2012, the jury returned a verdict convicting Defendant as charged. At the conclusion of the ensuing sentencing hearing, the trial court consolidated Defendant's convictions for judgment and entered a judgment sentencing Defendant to a term of 132 to 168 months imprisonment. Defendant noted an appeal to this Court from the trial court's judgment.

## II. Substantive Legal Analysis

## A. Motion to Dismiss

In his initial challenge to the trial court's judgment, Defendant argues that the trial court erred by denying his motion to dismiss the second degree murder charge. More specifically, Defendant argues that the trial court should have dismissed the second degree murder charge on the grounds that

the record did not contain sufficient evidence to establish that he acted with malice. Defendant's argument lacks merit.

## 1. Standard of Review

A motion to dismiss for insufficiency of the evidence requires the court to determine whether the record contains substantial evidence supporting each element of the offense charged and identifying the defendant as the perpetrator. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651-52 (1982) (citing *State v. Roseman*, 279 N.C. 573, 580, 184 S.E.2d 289, 294 (1971)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citations omitted). In deciding a motion to dismiss, the court is to consider the record in the light most favorable to the State, giving the State the benefit of every reasonable inference that can be drawn from the evidence. *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). The fact that the record reveals the presence of contradictions and discrepancies in the evidence does not warrant dismissal of the case, since such contradictions or discrepancies simply signal the existence of issues for the jury's consideration. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992).

## 2. Sufficiency of the Evidence of Malice

Second degree murder is "the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Snyder*, 311 N.C. 391, 393, 317 S.E.2d 394, 395 (1984). "While an intent to kill is not a necessary element of second degree murder, the crime does not exist in the absence of some intentional act sufficient to show malice and which proximately causes death." *State v. Wilkerson*, 295 N.C. 559, 580, 247 S.E.2d 905, 917 (1978). The malice necessary for guilt of second degree murder exists "when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief." *State v. Reynolds*, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982). In order to prove the existence of malice in a case arising from the operation of a motor vehicle, "[t]he State need only show 'that defendant had the intent to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind,'" *State v. Miller*, 142 N.C. App. 435, 441, 543 S.E.2d 201, 205 (2001) (quoting *State v. Rich*, 351 N.C. 386, 395, 527 S.E.2d 299, 304 (2000)), with sufficiently reckless conduct occurring while the defendant drives in an impaired state being sufficient to support a second degree murder conviction. *State v. Patterson*, 209 N.C. App.

708, 715, 708 S.E.2d 133, 137-38, *disc. review denied*, 365 N.C. 203, 709 S.E.2d 920 (2011). The extent to which the State has adduced sufficient evidence to establish the existence of malice depends, in the final analysis, on the facts and circumstances present in each case. *State v. McBride*, 109 N.C. App. 64, 67, 425 S.E.2d 731, 733 (1993).

A careful review of the record developed before the trial court, when taken in the light most favorable to the State, indicates the existence of ample evidence tending to show that Defendant acted with the malice necessary to support a second degree murder conviction. As the record reflects, Defendant, after staying up virtually all night, drove over the high rise bridge at a speed in excess of 100 miles per hour and slammed into the rear of Mr. Knott's truck without having made any effort to slow down or to take any sort of evasive action in an attempt to avoid the collision. In addition, the existence of evidence to the effect that Defendant had been in possession of LSD within hours prior to the collision; that Defendant's behavior suddenly became "agitated" and "belligerent"; that Defendant had dilated pupils, behaved erratically, and made bizarre statements after the collision; that law enforcement and medical personnel believed that Defendant was "higher than a kite" and "really really impaired"; and that an expert witness

had concluded that Defendant's behavior was consistent with that which would be expected following the consumption of LSD provides ample justification for a conclusion that Defendant was substantially impaired by the effects of LSD at the time that he collided with Mr. Knott's truck. Thus, the record contains ample evidence tending to show that Defendant engaged in exceedingly reckless conduct while driving in an impaired condition. As a result, when considered in the light most favorable to the State, we believe that the record contains more than sufficient evidence to establish "'that defendant had the intent to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind,'" *Miller*, 142 N.C. App. at 441, 543 S.E.2d at 205 (quoting *Rich*, 351 N.C. at 395, 527 S.E.2d at 403), a determination that supports the trial court's decision to deny Defendant's dismissal motion.

In seeking to persuade us to reach a different result, Defendant argues that, while his conduct was clearly reckless, the recklessness that he exhibited at the time of the collision did not rise to the level necessary to support a second degree murder conviction. As support for his position, Defendant argues that the record reveals nothing more than "such recklessness or carelessness . . . as imports a thoughtless

disregard of consequences or a heedless indifference to the safety and rights of others," *State v. Mack*, 206 N.C. App. 512, 517, 697 S.E.2d 490, 494 (citing *State v. Wade*, 161 N.C. App. 686, 589 S.E.2d 379, 382 (2003)), *disc. review denied*, 364 N.C. 608, 704 S.E.2d 276 (2010), of the type necessary to support an involuntary manslaughter conviction; cites several cases concluding that the record contained sufficient evidence to establish the existence of malice; and argues that those decisions establish that a second degree murder conviction, as compared to an involuntary manslaughter conviction, would not be appropriate in the absence of unequivocal evidence of impairment or driving after the defendant's license had been revoked, multi-faceted bad driving, and one or more prior convictions for impaired driving or driving while license revoked. As a result of the fact that he had a clean driving record, that the testing performed at the hospital did not reveal the presence of alcohol, that there were alternative explanations for his physical condition and the behaviors that he exhibited after the collision, and that he did not run a stop sign, swerve or drive on the wrong side of the road, Defendant asserts that the record did not demonstrate the existence of the malice needed to support a second degree murder conviction.

The fact that Defendant's driving may not have been as deficient as others deemed to have acted with malice does not, contrary to Defendant's argument, establish that the record was insufficient to support his conviction for second degree murder. As this Court has previously stated, "we need not engage in fine tuning exactly how fast a defendant must be driving, or how many stop signs or red lights he must run to provide sufficient evidence of malice." *State v. Lloyd*, 187 N.C. App. 174, 179, 652 S.E.2d 299, 302 (2007), *cert. denied*, 363 N.C. 586, 683 S.E.2d 214 (2009). Although the fact pattern present in this case is, not surprisingly, somewhat different than that present in other cases that have been decided in this jurisdiction in the past, we have no hesitation in concluding that driving at a high rate of speed on a high rise bridge while in an impaired condition and colliding with another vehicle from the rear without any effort having been made to avoid the collision is more than sufficient to establish the existence of the malice necessary for a second degree murder conviction. As a result, the trial court did not err in denying Defendant's dismissal motion.

## B. Jury Instructions

In his second challenge to the trial court's judgment, Defendant argues that the trial court erred by instructing the

jury that voluntary intoxication did not suffice to negate the existence of the malice necessary for guilt of second degree murder. More specifically, Defendant contends that a voluntary intoxication instruction should not have been delivered given that Defendant had been charged with second, rather than first, degree murder and given that the challenged instruction undermined Defendant's contention that he was not impaired at the time of the collision. We do not find Defendant's argument persuasive.

## 1. Standard of Review

"[Arguments] challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court." *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). "However, an error in jury instructions is prejudicial and requires a new trial only if 'there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises.'" *State v. Castaneda*, 196 N.C. App. 109, 116, 674 S.E.2d 707, 712 (2009) (quoting N.C. Gen. Stat. § 15A-1443(a) (2007)).

## 2. Voluntary Intoxication Instruction

At the conclusion of Defendant's trial, the trial court instructed the jury with respect to the issue of Defendant's

guilt of second degree murder and included in its instructions concerning the issue of Defendant's guilt of that offense a statement contained in a footnote to N.C.P.J.I. 206.32A to the effect that, "[i]n a prosecution for second-degree murder, one's voluntary intoxication from drugs does not negate the element of malice."[2]   According to Defendant, a voluntary intoxication instruction such as that at issue here should only be given in cases involving specific intent crimes such as first degree murder, where "a potential defense to negate specific intent to kill arises on evidence of intoxication."   Although we agree with Defendant's contention that voluntary intoxication is only a defense to specific intent crimes, we are unable to concur in his assertion that the trial court erred by delivering the challenged instruction in this case.

-----

[2]As Defendant notes, the footnote from which the language utilized by the trial court was derived contains a citation to the decision in *State v. Snyder*, 311 N.C. 391, 393-94, 317 S.E.2d 394, 395-96 (1984).  Although Defendant argues at some length that nothing in *Snyder* supports the use of the language contained in the trial court's instruction in a second degree murder case arising from the operation of a motor vehicle, we note that the citation to *Snyder* in the footnote in question supports the definition of malice utilized in the relevant pattern instruction and has nothing to do with the language relating to the impact of a defendant's voluntary intoxication upon the existence or non-existence of the malice needed to support a second degree murder conviction.  As a result, we need not address Defendant's challenge to the citation to *Snyder* contained in N.C.P.J.I. 206.32A in this opinion.

As Defendant notes, "[v]oluntary intoxication is a defense only to those crimes which require a showing of a specific intent." *State v. White*, 291 N.C. 118, 126, 229 S.E.2d 152, 157 (1976). For that reason, voluntary intoxication is not a defense to general intent crimes such as second degree murder. See *State v. Harvell*, 334 N.C. 356, 368, 432 S.E.2d 125, 131 (1993) (stating that "the law does not require any 'specific intent' for a defendant to be guilty of second-degree murder, and a defendant's voluntary intoxication does not negate that crime"); *State v. Harris*, 171 N.C. App. 127, 131, 613 S.E.2d 701, 704 (2005) (stating that "voluntary intoxication is no defense to a general intent crime or a strict liability offense.") In the face of a contention similar to that advanced in this case in an appeal arising from the defendant's conviction for failing to register as a sex offender, this Court held that, since the defendant had not been charged with committing a specific intent crime, the defendant was not entitled to rely on a voluntary intoxication defense and that "the trial court did not err by instructing the jury accordingly." *Harris*, 171 N.C. App. at 132, 613 S.E.2d at 704. Similarly, since Defendant was not charged with committing a specific intent crime in this case, he was not entitled to rely on a voluntary intoxication defense and the trial court did not

err by communicating that information to the jury in its instructions.[3]

Even if the trial court did, in fact, err by instructing the jury that voluntary intoxication did not suffice to negate the existence of malice in this case, we are unable to see how the delivery of that instruction prejudiced Defendant. In attempting to persuade us that the necessary prejudice exists, Defendant argues that the challenged instruction effectively pre-judged the factual question of whether Defendant was, in fact, intoxicated and that acceptance of his contention that he was not impaired was critical to his attempt to avoid a second degree murder conviction. We believe, however, that Defendant's

---

[3]In his brief, Defendant asserts that a decision that the trial court did not err by including the challenged instruction concerning the impact of involuntary intoxication on the existence or non-existence of the malice needed to support a finding that Defendant was guilty of second degree murder would be tantamount to a determination that the challenged instruction should be given in every case in which the defendant was accused of second degree murder on the basis of an unintentional killing. We are unable to agree with this assertion given that such an instruction is not essential to an adequate discussion of the substantive issues that a jury is called upon to resolve in a second degree murder case arising from the operation of a motor vehicle. As a result, even though it might not be an error of law to deliver an instruction like the one at issue here in a second degree murder case arising from the operation of a motor vehicle, we see no reason for the delivery of such an instruction in such cases on a routine basis and suggest that the trial bench would be well-advised to refrain from delivering such an instruction in second degree murder cases arising from the operation of a motor vehicle in the absence of some specific reason for delivering such an instruction.

argument reads too much into the challenged instruction, which merely stated that "voluntary intoxication does not negate the element of malice" and never suggested that Defendant was, in fact, intoxicated.  For that reason, we conclude that, even if the trial court erred by instructing the jury that voluntary intoxication did not negate the existence of malice, we do not believe that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached."  *Castaneda*, 196 N.C. App. at 116, 674 S.E.2d at 712.  As a result, Defendant is not entitled to relief on appeal based on the delivery of the challenged instruction.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that none of Defendant's challenges to the trial court's judgment have merit.  As a result, the trial court's judgment should, and hereby does, remain undisturbed.

NO ERROR.

Judges ROBERT N. HUNTER, JR. and DAVIS concur.

Report per Rule 30(e).